## Connor v. Duquesne Brewing Co.
## Harvey v. Duquesne Brewing Co.

Before OLBUM*, SILVESTRI & BOLTE, JJ.

*Carl D. Smith, Louis Vaira* and *Murray S. Love,* for plaintiffs.

*Thomas D. MacMullan,* for defendants.

SILVESTRI, J., June 30, 1971.—These two cases are before the court on separate motions for a new trial and the removal of a compulsory nonsuit. The Budget Laundry v. Munter and Davis case was tried ex parte and a verdict in favor of plaintiff in the amount of $21,909 was returned by the jury. Defendants seek

---

* Judge Olbum heard the oral arguments but died on June 18, 1971, before he had an opportunity to consider this opinion.

a new trial in relief of this verdict. In the Conner and Harvey v. Duquesne Brewing Company cases, plaintiffs seek removal of a nonsuit entered against them when neither plaintiff nor their counsel appeared and no testimony was offered to support their claims. Although the circumstances surrounding each case are somewhat different and will be set forth at some length later in this opinion, the controlling principles of law are the same and thus the discussion of the issues herein is equally dispositive of both cases.

These motions raise fundamental questions as to the power and ability of this court to establish a calendar of cases and the extent to which it can enforce that calendar and control the movement of cases. Specifically, can this court require that a case be tried at a given time despite the fact that one of the litigant's counsel is unavailable due to other commitments?

The decision in this case has important ramifications for the bench and bar in this county and may well be determinative of whether this court has the power to clear the congestion which threatens to bring chaos to our system of justice and whether this court can restore confidence in our system of justice, confidence that is necessary for the effective function of government.[1]

---

[1] The Supreme Court of Pennsylvania has recently called for a searching examination and reappraisal of our judicial processes and systems in order to restore this lost confidence, Commonwealth ex rel. Carroll v. Tate et al., 442 Pa. 45, 55 (1971):

"The confidence, reliance and trust in our Courts and in our Judicial system on the part of the Bench and the Bar, as well as the general public, have been seriously eroded. We cannot permit this to continue. In order to improve and expedite Justice, it is both important and imperative that we re-examine and reevaluate our courts and their administration, our Judicial processes and our entire Judicial system."

And in the concurring opinion of Justice Pomeroy at page 63:

"The imperative reexamination which the Court has called for

In order to understand the basis of this decision, it is first necessary to trace the history of a law suit in our court from the time it is first filed in the office of the prothonotary, to the trial list and final disposition.

After a complaint has been filed in the prothonotary's office, all pleadings completed and preliminary motions and objections disposed of, a case may be placed on the issue docket by the praecipe of either party 60 days from the date of service of the original complaint at which time it is given an issue number.[2] Once a case has been placed at issue it is listed for a pretrial conciliation.[3] After the date is set for the pretrial conciliation conference, there can be no further discovery proceedings except by leave of court; the parties are required to file a statement listing all items of special damage, the names and addresses of all persons who may be called as witnesses, and all medical and other expert reports.[4] Therefore, when a case is placed at issue, then scheduled for pretrial conciliation, it is a representation by the parties that the case is ready for trial, that discovery has been completed, the issues have been formulated and the witnesses are prepared to testify.

A master conciliation list is prepared from those cases at issue for pretrial conciliation in a manner designed to allow all counsel an opportunity to receive

---

is, as I view it, one which must engage the attention and energy of all branches of government and of the public as well, but remain a principal preoccupation and responsibility of the members of the judiciary, particularly this Court, and of the bar."

[2] Local Rules of the Allegheny County Common Pleas Court 214*(h) Issue Docket—Appendix B.

[3] Local Rules of the Allegheny County Common Pleas Court 212*I-C—Appendix A.

[4] Local Rules of the Allegheny County Common Pleas Court 212*V and VI—Appendix A.

an equitable share of cases and so as not to create a conflict of time for the attorneys at conciliations. Approximately 500 cases are placed on this list and assigned to 10 judges to hear in a four to five day period. The master conciliation list is published 60 days in advance of the conciliation date.[5] In addition, approximately 30 days in advance of the conciliation date, each attorney who has entered his appearance is notified by mail that his case is scheduled for conciliation, the name of the judge before whom the conciliation is to take place, the date and time of day.[6]

Those cases which are not settled or otherwise disposed of at conciliation are referred back to the calendar control clerk for placing on a ready trial list. Such cases will normally appear on the second or third jury trial term following the conciliation all of which the trial bar is aware. A master trial list is prepared from cases referred to trial from the conciliation list taking those cases with the lowest issue number, while at the same time taking care to be sure that all counsel receive an equitable share of cases and that there is as little conflict as possible with individual attorneys on each day's listing. The list is prepared and conflicts are reconciled on the basis of the attorney whose name is on the pleadings or whose appearance has been formally entered. The cases are not selected solely on the basis of their issue number, because individual counsel or firms often have several consecutive issue numbers. The selecting of cases for the master trial

---

[5] The list contains the caption, term and number of the case and the names of attorneys representing parties involved in the case. The names of attorneys are taken from their formal written appearances or if they have not filed a written appearance from pleadings which have been entered in the case.

[6] Local Rule of the Allegheny County Common Pleas Court 212*II—Appendix A.

list is a difficult task; to keep cases from the list simply because an individual attorney or firm has a large number of cases awaiting trial can mean that opposing counsel will have his case delayed an inordinate time even though he and his witnesses may be available and anxious to have the case decided. On the other hand, to list a large number of cases from any one firm or individual would work a hardship on the trial bar in general and only a few firms or attorneys would have their cases on the list and others, in particular individual attorneys with only a few cases in their office, would have to bear interminable delays.

The master trial list is published 60 days prior to the jury trial term during which the case is to be tried, setting forth the day it will appear on the daily trial list.[7] At the time of the publication of the master trial list, there is also published a statement of this court's policy in regard to the disposition of cases on the list. This "Trial Policy" reflects the court's belief that a major reason for the backlog in our metropolitan courts is delay on the part of trial counsel, a delay caused either because they have too many cases in their office and insufficient counsel to handle them, or because the cases have not been adequately prepared, witnesses are not available, or medical experts are unable to find the time in their own schedules to appear for the trial. That policy is as follows and provides that cases on the list will not be continued because counsel or one of the persons necessary for the trial will not be available.

---

[7] The list contains the caption, term and number of the case and the names of attorneys representing parties involved in the case. The names of attorneys are taken from their formal written appearances or, if they have not filed a written appearance, from pleadings which have been entered in the case.

## "TRIAL POLICY

"The following will be applicable to both plaintiff and defense counsel on all cases published:

"1. Counsel as listed for the case must be available and ready to try the case at the time it is called;

"2. If listed counsel is not available for whatever reason then they must be substituted for;

"3. If a firm does not have sufficient trial counsel to substitute, provision must be made to obtain other trial counsel;

"4. If listed counsel is not available and no substitute provided, the case will proceed without counsel; ·

"5. The foregoing will apply regardless of the direction or desires of the corporate or individual client.

"When the list of cases is first published it is the duty of your firm to double check the readiness of your cases as to bills, reports, etc. and the availability of witnesses, doctors, experts, etc. involved in the case.

"When it is ascertained that any person necessary for the trial of the case may not be available during the trial term then the deposition of that person for use at trial must be taken forthwith.

"No continuance will be granted for out of town business trips, vacations, etc. or any absence during trial terms of either counsel or persons necessary to the trial of the case or failure to comply with any of the foregoing.

"When counsel is called to pick a jury, failure to appear within 15 minutes will result in a clerk picking the jury and the case being sent to trial without counsel.

## "PRETRIAL MOTIONS

"The calendar control judge will receive all uncon-

*tested motions relating to discovery and amendment of pleadings each morning in courtroom No. 7 following the call of the daily trial list.*

*"All contested motions relating to discovery and the amendment of pleadings will be heard on Friday afternoons at 1:30 o'clock only."*

Approximately 500 cases are placed on the master jury trial list for each jury trial term. At the beginning of the jury trial term and on each day thereof, a daily trial list is published. Depending upon factors such as the number of cases settled, when they settle, the length of time required to try a case, the availability of judges, jurors and courtrooms a particular case may be called for jury selection or actual trial from one to 10 days after it appears on the daily trial list, a fact of which the trial bar is well aware.

The foregoing applies to all cases. However, at any time prior to publication of the master trial list, if in a particular case there are numerous parties, complex questions of law or fact and the trial of the case will be protracted, the calendar control judge, on his own motion or upon application of any party or at the suggestion of any other judge before whom the case may have come, it may be designated a "Complex Case" and assigned to a specific judge who will preside over all matters pertaining to the case in order that the numerous parties may be accommodated and the case most effectively handled by this court. There are special rules governing the handling and disposition of "Complex Cases."[8]

In order to maintain the procedures outlined

---

[8] Local Rules of the Allegheny County Common Pleas Court, 212* VII—Appendix A.

above and facilitate the efficient running of the trial list, it is necessary to rely on the only source of knowledge this court has in determining what attorney will be responsible for the trial of the case; the names as they appear on the pleadings and written appearance of counsel. No other attorney is recognized as representing a party until and unless this court is notified of a change in counsel, a change which this court will permit only if it does not result in a delay of the trial or other disposition of the case.

The objective of these rules is to ensure that all parties and counsel have adequate notice of the scheduling of the trial of their lawsuit and that they must be prepared for their day in court under any circumstances. Therefore, when a case is placed at issue, scheduled and heard at pretrial conciliation and if not then settled and is published on the master trial list, this court has the right to assume that the case is ready for trial and that all parties and counsel are prepared to proceed to trial.

These policies are made necessary and are strictly enforced in large part because of the concentration in a few law firms and individual lawyers of the bulk of litigation before this court and the limited number of judges available to hear jury trials. Preparing a trial list is thus three dimensional; not only must scheduling conflicts be reconciled between counsel for plaintiff(s) and defendant(s) but for cases within the same office and with a view toward the number of judges normally available during a trial term. For example, based on the number of appearances in all cases *at issue* as of April 26, 1971, the following breakdown appears:

*Table of Appearances*

| *Plaintiff* Number of Appearances | Number of individuals or firms who have entered an appearance in a corresponding number of cases |
|:---:|:---:|
| 200-250 | 1 |
| 150-199 | 0 |
| 100-149 | 4 (including the firm of Sikov & Love— counsel for movants herein) |
| 75-99 | 5 |
| 59-74 | 18 |
| 25-49 | 31 |
| 10-24 | 91 |
| 5-9 | 75 |
| 1-4 | 287 |

| *Defendant* Number of Appearances | Number of individuals or firms who have entered an appearance in a corresponding number of cases |
|:---:|:---:|
| 600-700 | 1 |
| 500-599 | 2 |
| 400-499 | 1 |
| 300-350 | 3 |
| 200-249 | 3 |
| 150-199 | 2 |
| 100-149 | 3 |
| 75-99 | 2 |
| 50-74 | 4 |
| 25-49 | 15 |
| 10-24 | 35 |
| 5-9 | 65 |
| 1-4 | 304 |

With this high concentration of cases in a few firms and individuals, firms which often employ a limited number of trial attorneys, it is an extremely difficult task to dispose of cases while not creating conflicts and at the same time moving the trial list.

It also must be remembered that these figures represent only those cases which have actually been placed at issue. They do not include cases in which summons or complaints have been filed or claims in an office which have not reached the formal lawsuit stage. The picture is also complicated in that several offices represent both plaintiffs and defendants. Therefore, in preparing the trial list, the calendar control clerk must balance the interest of individual firms in seeing that enough of their cases appear on the list but not more than they are able to handle, as well as the interest of opposing firms in making up the calendar. These rules were designed to make the task possible while at the same time reducing the tremendous backlog of cases before the court.

It might be possible for this court to cater to the other commitments of every attorney who practices before it and the availability of lay and expert witnesses if we had an unlimited number of judges, courtrooms, juries, clerks, etc. However, such is not the case. In Allegheny County we have 31 judges in the Common Pleas Court.[9] Four of these judges are assigned to the Family Division, four to the Orphans' Court Division, six to the Criminal Division and 17 to the Civil Division. In the Civil Division, which hears all civil cases other than those initially heard in arbitration but also hears appeals from arbitration, sum-

---

[9] The separate courts of Common Pleas were abolished by the new Judiciary Article and vested in one Court of Common Pleas, Pennsylvania Constitution, art. V, sec. 4.

mary offenses and administrative agencies, there is the President Judge of the Common Pleas Court whose time is limited because of administrative problems and rightly so, but still limited to the extent that he cannot hear jury trials; another judge is assigned to the assignment room to hear daily motions and petitions;[10] one is assigned to hear tax appeals, one is assigned to hear nonjury appeals from arbitration and other civil actions where the parties agree to be heard nonjury; one hears summary appeals from administrative agencies and assists the Family Division, and finally, two judges are assigned to calendar control with one directly responsible for the movement of the trial list although the two together conciliate each case prior to the selection of the jury for that case. This leaves, at the maximum, 10 judges who can hear *jury* trials. By reason of health, personal obligations, prior commitments, complex cases, equity cases and opinions, this number during a given jury trial term is reduced even further. We have, however, managed to average eight judges during a trial term to hear jury cases, including the occasional services of a senior judge. This limited number of judges must dispose of more than 500 cases during each five to six-week jury trial term.

In order to reduce the backlog confronting this court, as many of the cases on the trial list as possible must be disposed of once and for all. If an attorney, particularly one representing a firm with a large number of cases, requests a delay or a continuance that has a direct effect on the movement of the rest of the trial list. A continuance or delay granted to one attorney means that opposing counsel is also delayed and

---

[10] Local Rules of the Allegheny County Common Pleas Court 249*1—Appendix C.

other cases in which he may be involved are also delayed.

In addition, other cases in the office of the attorney requesting the delay are also put back as he can only be scheduled for a limited number each time. The court may be able to compensate for or minimize continuance and delays by placing fewer cases on the list for trial each term. However, this would mean that fewer cases would be disposed of not only because they would not have an opportunity for a jury trial but because they cannot be settled without the pressure of imminent trial. Thus, not only are cases that actually require a jury trial delayed but additional cases which would settle due to the imminence of trial are delayed, which tends to clog the court calendar. Our figures show that from the master trial list we will settle a minimum of 65 percent of the cases through pre-jury selection conciliation and that of the balance a minimum 20 percent will settle at various stages from jury selection to just before verdict. It is a matter of judicial knowledge that cases do not settle unless the parties are told and know that they are going to trial and that the only way that we can require them to go to trial is to insist that counsel be substituted for when, for some reason, counsel of record is not available. Therefore, in order to keep the trial list moving, it cannot be enlarged to the point where counsel know their case may not be reached nor can we permit their non-availability due to other commitments to delay the disposition of the case. The length of delay is of serious consequence whether it be one, two or three days. To withhold a case from trial for any amount of time to await one counsel in another trial in our court or a sister court while it may superficially sound like a reasonable request, when viewed from the number of cases and attorneys we have to deal with even making

such allowance for one attorney would stack up the list because it means that the opposing attorney, parties and witnesses would have to wait for him to finish and that an attorney who is thus waiting has other attorneys anticipating his availability and other attorneys, parties and witnesses waiting for the third attorney and so on. One can readily see the pyramiding backlog in the case of delay involving only one case, to do so for all attorneys in the same situation would make it impossible to conduct an orderly trial list.

We have briefly alluded to the problem of court backlog and what causes it and the literature is full of articles decrying the problem and setting forth suggested solutions.[11] Many factors contribute to the backlog in our civil courts. Commencing lawsuits by writ of summons just prior to the expiration of the statute of limitations, then waiting an inordinate length of time to file a complaint; filing dilatory pleadings, over-estimating the value of a claim (claimants' or plaintiffs' attorney); failing to comply with discovery proceedings or submit required reports or appear for medical examination; by injecting non-existing or spurious defenses; by shunting aside the "small" case or the case of tenuous liability in favor of "better" cases; by joining multiple additional defendants who are not actually involved; by undervaluing cases (defense firms or insurance carriers); by parties and witnesses who remove themselves from the jurisdiction for various reasons notwithstanding they know their cases are pending on the trial list and attorneys and firms resisting suggestions that they employ additional trial counsel despite the fact they continuously seek

---

[11] See Carroll v. Tate, supra, at page 64, and the concurring opinion of Justice Pomeroy, footnotes 2, 3, 4, for an excellent collection of articles dating back to 1906.

delays because of other commitments and for reasons of vacation, health and personal problems. Doctors and other experts also add to the problem by being unwilling to cooperate on legal matters or contending they are too busy because of their own affairs. Judges are not without blame; judicial administration is an unknown art and our courts have for too long languished under archaic procedures designed for a day long gone, and while the majority of judges are hard working and adequately trained, some by reason of background, age and health, cannot bear the full burden of the work of a modern trial judge. Others are often swept up in petty administrative details which could adequately be handled by trained clerks if they were available and many judges find it difficult to keep their chambers open to attorneys seeking assistance. Delay can also be attributed to our inadequate rules of procedure which build delay into the system.

In his address to the First National Conference on the Judiciary on March 11, 1971, President Nixon, using an old maxim and emphasizing the need to eliminate delays in bringing criminal cases to trial, said that "Justice delayed is not only justice denied—it is also justice mocked, and the system of justice undermined." The same is true of justice in our civil courts where delays are often longer and just as cruel. Chief Justice Burger at the same conference made this remark relative to the efficient administration of justice:

"Independent of what we do in the courtroom itself, we need careful study to make sure that every case which reaches the courtroom stage is there only after every possibility of settlement has been exhausted. Those parties who impose upon the judicial process and clog its functioning by carrying the cases through jury selection before making a settlement which could

have been made earlier should be subject to the risk of a very substantial discretionary cost assessment at the hands of the trial judge who can evaluate these abuses of the system. Someone must remind the bar and the public of the enormous cost of a trial."

It is the objective of our trial policy to encourage settlement of disputes which do not have to go to trial and, as noted above, this can only be done when parties know that a trial is imminent at the risk of an adverse decision by a jury or the expense of jury trial is normally the deciding factor in whether or not a case will be settled.[12]

It is the particular duty of the judges of this Commonwealth to lead the attack on court backlog and delay in individual cases if we are to have any hope or reform:

". . . [D]espite widespread pessimism about our ability to cure the ills of the courts, progress is possible when judges are willing to experiment and support changes." 57 A.B.A. Journal, 228, "Are Courts Going the Way of the Dinosaur?": Tamm, Judge of the United States Court of Appeals for the District of Columbia.

The Pennsylvania legislature has recognized this duty and has provided a mandate to the judges of the Supreme Court and Courts of Common Pleas to see that all actions in their respective courts are reached

---

[12] "The Court backlog is not primarily a trial problem but is a settlement problem. Therefore, the principal area toward which attention should be directed is to devising better methods for bringing a case to the point of settlement. Increased motivation for settlement should be provided to litigants and increased power given to the court and to the parties to impose some sanctions on those litigants who refuse a reasonable settlement": Remarks of Gilbert J. Helwig, President, Academy of Trial Lawyers of Allegheny County to Legislative Task Force on Court Backlog.

and have a fair *opportunity* of a trial within one year after they are commenced:

"Causes to have opportunity for trial during year; penalty for judge's neglect.

"It shall be the particular duty of the judges of the supreme court and judges of the courts of common pleas, to see that all actions in their respective courts shall be reached and have a fair opportunity of a trial, at least within one year after they shall have been commenced; and if the judges of the supreme court, or the presidents or associate judges of the court of common pleas, or any of them, shall refuse or neglect to perform the duties enjoined on them by this act, it shall be deemed misbehavior in office, and lay a sufficient ground for the removal of the judge or judges so offending": Feb. 24, 1806, P. L. 334, 4 Sm. L. 270, §22, 17 PS §895.

In order to meet this duty, this court must have control of its calendar; it cannot be subject to the individual problems and case load of every member of the bar. The law exists primarily to preserve social values through the orderly resolution of controversies, the individual litigant is merely an instrumentality whose activities and relationships with others create rights, duties, privileges and immunities which must be given legal effect in the interests of the community. This is not to say that the law cares nothing for people as people, but it seeks only to regulate their conduct, not to deal with personal stresses and conflicts; to that end, individual litigants, attorneys and witnesses must learn to comply with rules of this court designed for the orderly and efficient administration of justice and the speedy resolution of controversies not as a service to individual litigants but to the society as a whole.

With the foregoing as background, we now address ourselves to the individual cases and the facts and

issues of record now before us. First are the cases of Connor v. Duquesne Brewing Company and Bookameyer, April 1970, No. 1017, and Harvey v. Duquesne Brewing Company and Bookameyer, April 1970, No. 2309, in which plaintiffs, through their attorney, Murray S. Love, of the firm of Sikov & Love, have filed motions for a new trial. The complaints in both cases are identically the same except as to the party plaintiffs and arise out of the same set of circumstances. In fact, both could have been brought originally in one action. The complaint in the Connor case was filed on February 5, 1970, and in the Harvey case a month later, March 10, 1970. Plaintiffs, both minors, were passengers in an automobile which collided with a coal pile which had been placed in the highway by defendant. Both complaints contain separate counts on behalf of the parents of the said minors and were signed by F. Regan Nerone, Esq., an attorney with the firm of Sikov & Love. Appearances on behalf of defendant were entered by C. Donald Gates, who filed a complaint to join William Bookameyer, the driver of the automobile, as an additional defendant. Each pleading after the complaint in the Harvey case on behalf of the plaintiff bore the signature of William Berger, Esq., another attorney in the offices of Sikov & Love. In the Connor case all pleadings other than the complaints and praecipe for issue bear the signature of William Berger, Esq. The Conner case was placed at issue on March 31, 1970. On October 9, 1970, both cases, pursuant to our mass conciliation procedure, were conciliated before Judge Ellenbogen. Although the record is not clear as to the attorneys who appeared at conciliation before Judge Ellenbogen, it does appear that the pretrial conciliation statement required by our Rules was signed by William Berger, Esq. The cases were not settled and were returned ready for

trial together with an order dated October 14, 1970, consolidating the cases for trial.

On December 8, 1970, both cases were published in the Pittsburgh Legal Journal on the master trial list for January 19, 1971. At that time, William Berger, Esq., was listed as counsel for plaintiffs, he being the only attorney whose name appeared on all pleadings for plaintiff. On January 18, 1971, cases were again published on the daily trial list. On January 19, 1971, at the call of the daily trial list, Thomas D. MacMullan, Esq., was substituted as counsel for C. Donald Gates for defendants. On January 20, 1971, the cases were conciliated before Judge McLean with William Berger, Esq., as attorney for plaintiff. On January 25, 1971, the court was informed that only Murray Love, Esq., could try the case as counsel for plaintiffs. On January 27, 1971, the consolidated Connor and Harvey case was ready for jury selection and it was announced to the court by Mr. Sikov, of the firm of Sikov & Love, that only Murray Love could try the case and that he was then before Senior Judge Lansberry of our court and was next scheduled for trial in the United States District Court. This court ordered the selection of the jury in its normal turn and the jury was selected without Murray Love or any other attorney from his office in attendance. Defense counsel was present at all times. On January 28, 1971, the cases were sent to the courtroom of the Honorable David Olbum for trial; again, no one appeared on behalf of plaintiffs except Mr. Sikov to object to the proceedings, who upon being overruled retired from the courtroom. Counsel for defendants appeared and was ready to proceed. Neither plaintiffs nor counsel for plaintiffs appearing, defendants' motion for a compulsory nonsuit was granted. The record fails to disclose that either party made application to have the cases designated "Com-

plex" pursuant to Rule 212 *VII nor did Judge Ellenbogen or Judge McLean suggest at the conciliation of these cases that they should be designated "Complex."

The Budget Laundry case in which the firm of Sikov & Love were counsel for defendant was commenced by a complaint in assumpsit on May 17, 1968, wherein attorney Louis Vaira represented plaintiff.

The essence of the complaint is that defendant breached his contract for the receipt of certain services and the lease of particular property and that plaintiff had incurred damages for rent and lost profits or in the alternative a sum to be measured by a liquidation clause in the contract in the amount of $15,000. Defendants filed an answer, new matter and counterclaim denying the averments in the complaint and alleging that plaintiff had breached the contract in that the services were performed in an unworkmanlike manner and that conditions on the rental premises forced defendant to seek another location and that their breaches resulted in damages to defendant in the amount of $100,000. At this point it is interesting to note that Carl P. Munter as a plaintiff had, by attorney Frank Reich[13], commenced an action against Budget Laundry by a praecipe for a writ of summons at January, 1965, No. 2790, on December 4, 1964, which was served on Budget Laundry as defendant on December 30, 1964. On January 26, 1965, Budget Laundry as defendant, by its attorney, obtained a rule to file a complaint. The complaint was not filed until October 9, 1968, three years later, at which time Murray Love appeared as attorney for Munter. Munter's complaint sets forth the identical facts set out in the answer, new matter and counterclaim of Munter and

---

[13] Attorney Frank Reich died on May 19, 1969.

Davis to the complaint filed by Budget Laundry. Preliminary objections by Budget Laundry to the complaint of Munter were filed on October 25, 1968. (The preliminary objections were not praeciped for the argument list and are still pending.)

On October 23, 1968, Budget Laundry placed its case at issue.

On March 1, 1970, the case wherein Budget Laundry is plaintiff was listed for mass conciliation before Judge Ellenbogen. Attorney Love requested that the conciliation be continued for the reason that the Budget laundry case against Munter and Davis should be consolidated with the Munter v. Budget Laundry case and for the further reason that Mr. Munter was out of the city and that Mr. Love as counsel for Munter had been unable to adequately prepare a pretrial statement; this, despite the fact that Murray Love filed a complaint on behalf of Munter v. Budget Laundry in October of 1968. In his request for consolidation, he stated that his answer to the claim of Budget Laundry was, in essence, the same claim on behalf of Munter v. Budget Laundry.[14] The cases were consolidated. On September 4, 1970, the cases were again listed for conciliation before Judge Bolte. Not settled, they were returned to calendar control marked ready for trial. On December 8, 1970, the cases were published in the Pittsburgh Legal Journal for the daily trial list of January 19, 1971. It is to be noted that the Connor and Harvey cases and the Budget Laundry cases were both scheduled on January 19th, the information that the court had was that William Berger

---

[14] The case of Munter v. Budget Laundry, January, 1965, no. 2790, is a classic example of many of the elements which contribute to the backlog, tarnishing the image of the courts in the eyes of the public when, in reality, the delay is attributable to the attorneys and not the courts.

was attorney of record in the Connor and Harvey cases and Murray Love was the attorney of record in the Budget Laundry cases. This was done consistent with our scheduling procedures so as not to schedule the same attorney for more than one case on the same day. Had the court known a sufficient time prior to publication of the master trial list that Murray Love was the actual counsel on both cases the consolidated Connor and Harvey case would not have been scheduled on the same day as the Budget Laundry cases. The Budget Laundry cases were called on the daily trial list on January 19, 1971. On January 27, 1971, when the cases reached their turn for selection of a jury, the firm of Sikov & Love was advised of the necessity of their presence.[15] Mr. Sikov again stated that the cases could only be tried by Murray Love who was then before Senior Judge Lansberry and was next scheduled for trial in the United States District Court. Mr. Sikov appeared specially on behalf of defendants to object to the selecting of the jury ex parte but was overruled. No one appeared to examine the jurors for defendants; however, counsel for plaintiff was present. On January 28, 1971, the case was sent to the courtroom of Judge Bolte for trial; neither defendants nor their counsel appeared. Again, Mr. Sikov appeared specially on behalf of defendants to object to the ex parte proceeding which was overruled. Plaintiff put in its case and a verdict was returned in its favor in the amount of $21,909. At no time was application made to designate this a "Complex Case" nor did Judge Ellenbogen or Judge Bolte at their conciliations of the cases indicate that these cases were "Complex Cases."

---

[15] The case instituted by Munter against Budget Laundry at January, 1965, no. 2790, was severed because of the pending preliminary objections.

## DISCUSSION

When Mr. Sikov appeared specially on behalf of Mr. Love and again at the argument on the motions, several facts were set forth which do not appear of record and which this Court had no way of ascertaining. It was movants' contention that the requested delay should have been granted because there was only one counsel familiar with the cases, namely, Mr. Love, that Mr. Berger had been listed as trial counsel in the Harvey and Connor cases erroneously and that the delay would only be for a matter of hours or a few days. This court rejected those arguments when the continuances were requested as it does now and they were unsupported by anything in the record and, in fact, the contrary is indicated by the record. In both cases it appears that the bulk of the preliminary matters, including settlement negotiations, were done by attorneys other than Mr. Love and that they were equally familiar with the cases and equally competent to try them. This court also had no way of knowing the extent of the delay whether it would be one hour or one month. Mr. Love's case in the United States District Court was a multi-party action[16] and the trial had been specially set. It is Mr. Love's contention that it is the duty of this Court to arrange with the United States District Court to release attorneys of their obligations before that body.

Stripped of these allegations, the contention of the movants appear as follows:

1. The court committed prejudicial error and an abuse of discretion in applying its trial policy to these cases and in refusing the oral motion made on behalf of counsel for the movants to delay the commence-

---

[16] As noted in movants' motion for new trial and removal of the nonsuit.

ment of the trials until movants' counsel was available to try the cases.

2. The court committed prejudicial error and an abuse of discretion in requiring the jury to be selected and the cases to be tried ex parte and without the presence of counsel either during the selection of a jury or during trial.

3. The court committed prejudicial error in that it is a violation to due process of law to refuse to permit movants to have counsel of their choice and in requiring them to substitute counsel.

4. That the court violated movants' right of due process of law and equal protection of the laws under the Constitution of the United States and under the Constitution of the Commonwealth of Pennsylvania by refusing to delay commencement of the trials to permit movants' counsel to complete a trial before a Senior Judge of this court and a trial to be commenced in the United States District Court.

We have already set forth the reason for this court's refusal to delay cases on the jury trial list. Specifically, in this situation if we were to accede to the wishes of Mr. Love, it would cause inconvenience and delay of two other counsel, the witnesses and parties connected with both cases, judges, tipstaves and clerks of this court to await his completing a case and then go to the United States District Court to try another case. This, in turn, causes the pyramiding effect of delay in cases awaiting opposing counsel and could, in fact, result in a later conflict with other cases on the list of opposing counsel so that other cases would have to be removed entirely from the trial list.

It is movants' contention that the policy of no continuance and substitutions of counsel is arbitrary and unreasonable. In support thereof they cite the case of Nerkowski v. Yellow Cab Co., 117 P.L.J. 275 (1969)

reversed 436 Pa. 306 (1969), in which the application of similar rule was found to be the abuse of discretion. In addition, they contend that this policy can only reasonably be applied where there has been a long history of continuance and delay and that such was not the situation in these cases.

It is firmly established that a court has the inherent power to dismiss cases that have remained dormant because of dilatoriness or inaction: Link v. Wabash Railroad Co., 370 U.S. 626 (1962):

"The power to invoke this sanction is necessary in order to prevent undue delays in the disposition of pending cases and to avoid congestion in the calendars of the District Courts": supra, at page 629.

In addition, it is also well settled that a court can make rules regarding the efficient disposition of claims before the court; in fact, that the court has a duty to provide such disposition as noted above.[17] Because the public welfare requires a person to assert his claim within a specific time or even in a specific manner, or else lose it, is no basis for a contention that he has been deprived of property without due process of law. *The State has the unquestioned right to cut off litigation;* to enact statutes of repose; to fix a time beyond which claims cannot be asserted in the courts. Reasonable conditions may be imposed as a condition of a hearing. Just because a rule of procedure may work particular hardship on a particular party does not make the rule wanting in due process.

The only requirement upon such rules is that they be reasonable and provide an "opportunity" for a hearing upon the merits: Armstrong v. Manzo, et ux. 380 U.S. 545 (1965); Schroeder v. New York City, 371 U.S. 208 (1962). States may generally set the terms on

---

[17] "Courts" Act of Feb. 24, 1806 P. L. 334, 4 Sm. L. 270, §22 supra.

which they will permit litigation in their courts, so long, at least, as the conditions are reasonable. It is only the unreasonable restraint upon the right of access to the courts which is violative of due process of law and unconstitutional. It is only when restraints upon access to the courts are "arbitrary, unequal and oppressive" so as to shock the sense of fairness that the Fourteenth Amendment was intended to apply: Chicago & N.W.R. Co. v. Nye Schneider Fowler Co., 260 U.S. 35 (1922).[18]

The published trial policy of this court is clearly not unreasonable and its application in these cases is not an abuse of discretion. In the first instance, these cases are not free of the delay or lack of prosecution claimed by movants as necessary for any deviation from the rules and policy of this court. In the Budget Laundry case, litigation concerning the facts of the case was actually instituted in 1964 and through movants' own delay a complaint was not actually filed until four years later and no further action was taken until a new suit was instituted by Budget Laundry and, in fact, the first case is still pending as hereinbefore noted. In addition, the case had already once been continued because of lack of preparation on the part of movants. The Connor and Harvey case had already been at issue

---

[18] The requirements of due process have recently been reiterated by the Pennsylvania Supreme Court in the case of Conestoga National Bank of Lancaster et al. v. Paterson, 442 Pa. 289 (1971).

" ' "Due process of law," while incapable of exact definition, generally means "law in the regular course of administration through courts of justice, according to those rules and forms which have been established for the protection of human rights". . . . Its essential elements are "notice and opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case before a tribunal having jurisdiction of the cause." . . .' " supra, at page 295.

almost a year and had been delayed by the original failure to bring the Connor and Harvey cases together in one suit and the eventual consolidation of the two cases. Secondly, while a hardship may be created in these cases, a greater hardship is created for opposing counsel and for others whose case could not be reached on the trial list or who might be delayed not to mention witnesses, experts, etc., who would again have to re-adjust their schedules, all this for the sole purpose of accommodating one attorney. The test of whether a rule or policy is unreasonable is not whether it creates a hardship in a particular case but whether it creates such a restraint upon access to the courts that it is violative of due process. The movants in this case have had their opportunity for a day in court. It is not our concern that because their counsel decided another case was more important or because they would accept no other counsel that they were unable to avail them-selves of it.

The Nerkowski case, supra, while it concerns a similar policy and rule of this court, is distinguished on its facts. In addition, the court did not find the trial policy there, which is similar to the one now being used by the court, unconstitutional. That case was found to involve complicated medical testimony and the unavailability of counsel[19] which was totally unanticipated and uncontrollable by the parties or counsel so that they could not have notice that counsel would not be available to try the case. In these cases before us, there is no indication of any complex factual or legal questions. The complaints in the Harvey and Connor case were the same. The injuries sustained were not extensive, the complaint in the Harvey case

[19] Counsel in that case was appointed to fill a vacancy in the Common Pleas Court of Allegheny County.

stated "the minor plaintiff sustained injuries to the left foot, and facial lacerations, and the muscles, ligaments, tissues, tendons and nerves in, about and extending from the left foot were strained, torn and dislocated." In the Connor case, plaintiff sustained "a fractured jaw, injuries to the teeth, lacerations on the neck, lips and face, and the muscles, ligaments, tissues, tendons and nerves in, about and extending from the aforementioned portions of the minor plaintiff's body were strained, torn and dislocated." In addition, it appears that other counsel were familiar with the case. William Berger, not Murray Love, prepared all the relevant and pertinent pleadings in the case including pretrial statements, and it was William Berger who appeared on the trial list as counsel who was to try the case and it was William Berger who appeared before Judge McLean for conciliation of the cases prior to jury selection.

Movants' second argument is that it was an abuse of discretion to require the cases to be heard without counsel or their clients being present. This is clearly a fallacious argument. In the first place, this court did not require that the case be tried by a jury selected ex parte; the only requirement of this court is that it be tried when a jury, judge and courtroom are available. It was movants' choice not to appear or substitute counsel.

There is no due process requirement that a party be accorded a jury trial at the party's convenience or the convenience of his counsel, the only requirement being that he be given notice and opportunity for a hearing. It is true that the Pennsylvania Constitution provides for a jury trial in civil cases but it does not mean that the rules and regulations regarding when and where the trial shall take place cannot be established by the court. There is no denial of due process

in the mere fact that a jury trial has not been held with all parties in attendance to present their cases where they had the opportunity to do so: Minneapolis & St. L. R. Co. v. Bombolis, 241 U.S. 211 (1916). (Holding that U. S. Constitution does not require the States to provide jury trials in civil cases).

Movants' third argument is that it has been deprived of a right to counsel is also without merit.

The legislature has provided that a party has a right to be heard by counsel:

"In all civil suits or proceedings in any court within this commonwealth, every suitor and party concerned, shall have a right to be heard, by himself and counsel or either of them": March 21, 1806, P. L. 558, 4 Sm. L. 326 §9, 17 PS §1601.

This right is not violated by the policy of this court in requiring a case to be tried when called whether or not counsel is available. This court by its policy of not granting continuances is not saying that an individual may not be represented by counsel, only that counsel be present when the court has fixed a time for a hearing of the individual's claim. Movants' argument through their attorney is that they have retained the services of Murray Love because of a reputation built over 15 years as a competent trial counsel, that they have a right to choose a particular counsel and that no other attorney was competent at the time fixed by the court to try their case. In addition, counsel argues that it will deprive them of their livelihood and the right to practice their profession because they will not be able to handle as many cases if they are forced to try their cases whenever scheduled.

It is this court's opinion that even assuming there is a right to a choice of counsel in civil cases, and we are not certain that such a right is required by due

process of law,[20] that right must be tempered when it causes delay in the trial of cases. No attorney admitted to the bar of the court has the right to be counsel of record for more clients than he can properly represent without causing unnecessary, excessive and undue delay of the trial of cases of the litigants he represents or of other litigants in this court. The lawyer is an officer of the court and to that end it is his primary duty to serve the court and the public and not his own interests: Sterling v. City of Philadelphia, 378 Pa. 538 (1954), and Nerkowski v. Yellow Cab Co., supra, opinion of the trial judge.

The same we think is true of litigants; they do not have a right to a counsel which will cause delay in the trial of their own cases or of other cases on the list because of counsel's unavailability. However firmly rooted their right to counsel of their choice may be, it does not follow that such a right embodies the right to have counsel of their choice try cases only when it is convenient for him to do so. The right of a litigant to counsel of his own choice must bow to the power of the court to regulate its own calendar.

We have already noted that these cases did not present special issues of complex law or facts and that, in our opinion, they could be tried by any attorney qualified before this bar.

The argument that this court is taking away counsel's livelihood is unrealistic and irrelevant to this case. The change in our society over the last 30 years has also brought a change in the method which attorneys must operate and by which individuals select their

---

[20] In Re Groban et al., 352 U.S. 330 (1957) and Anonymous v. Baker, 360 U.S. 287 (1959), holding that there is no right to counsel in civil matters required by due process.

counsel. This change has been recognized by the American Bar Association in their "Code of Professional Responsibility":

"Selection of a Lawyer: Generally

"EC 2-6. Formerly a potential client usually knew the reputations of local lawyers for competency and integrity and therefore could select a practitioner in whom he had confidence. This traditional selection process worked well because it was initiated by the client and the choice was an informed one.

"EC 2-7. Changed conditions, however, have seriously restricted the effectiveness of the traditional selection process. Often the reputations of lawyers are not sufficiently known to enable laymen to make intelligent choices. The law has become increasingly complex and specialized. Few lawyers are willing and competent to deal with every kind of legal matter, and many laymen have difficulty in determining the competence of lawyers to render different types of legal services. The selection of legal counsel is particularly difficult for transients, persons moving into new areas, persons of limited educations or means, and others who have little or no contact with lawyers."

The function of courts in our society is as an independent branch of government existing to resolve disputes among members of society. Our judicial system belongs to the public as a whole, it does not exist so that attorneys can reap a profit or attain more clients. The attorney is an officer of the court and, as such, he has only a privilege conferred upon him to represent clients before the court; he does not have the right to establish the time when he will be available to the court.

In particular, counsel's argument ignores the fact that the very existence of law firms is to handle a volume of legal business. This is normally done by

assigning to junior partners or attorney employes cases which they handle all the way to completion and in other cases by assigning to different members and associates of the firm various aspects of the same case. In such instances, the attorney working on or handling the case did not bring the client into the firm and his only contact with the client is in the preparation and trial of the case. A personal relationship between the attorney and client for the competent handling of the affairs of the client is not requisite to the establishment of a flourishing law practice or for achieving a compétence in the practice of law. The lawyer is a professional, and since he is an officer of the court, it is the responsibility of the court in serving the public interest to insist upon the attorney's being prepared and expecting no less than the highest level of professionalism from those lawyers practicing before it. That means a professionalism in his attitude to the court as well as to his clients or a professionalism which means that he will comply with court procedures in serving his clients.

What may have been true when we were an agrarian society and when litigation was at a minimum and due to a lack of communication and things were done at an easy pace, we now live in a frenetic world where we have a mobile complex urban society. Things are no longer done leisurely and the effect has been felt in all corners of society. Some professions, such as medicine, have kept up with the changing pace; it is time that the legal profession also brings itself in line with these "new" times.[21] What is sought today by litigants in this court is not a personal relationship or hand-holding but professional integrity and the

---

[21] Address by Chief Justice Warren E. Burger at the First National Conference on the Judiciary.

effective determination of a client's claim. This does not mean that such a relation cannot be developed, but that in the courtroom it is objectivity of facts and law which must be permitted to determine the outcome and not personal attachment.

The requirements of due process are that every person whose interests are involved in litigation is entitled to such notice of the pendency of the suit as is reasonably calculated to apprise him of the litigation and that he be given an opportunity to be heard.

"An elementary and fundamental requisite of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections": Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950).

There cannot be any question that movants did not have notice of the pendency of their action, and the span of time within which it was to be called. A party is deemed to have notice of all facts which may be charged upon his attorney, Smith v. Ayer, 101 U.S. 320 (1879), and the procedure outlined at the beginning of this opinion and which was followed in these cases is designed specifically with that in mind as well as making sure that the parties are prepared in their cases and have notice that they will be tried despite outside commitments of attorneys and the availability of witnesses.

The argument that Mr. Love should be permitted a delay to try a case in the United States District Court, or that, in the alternative, this court should request that he be excused from that litigation, does not move this court and is, in fact, repugnant to it. It is true that we have had a working agreement with the District Court to avoid conflicts, but we can only go so far with

that agreement. It must be up to counsel to make such arrangements as are necessary and to avoid conflicts on his own behalf. In addition, in the past several years in Allegheny County, there has been an underlying feeling that the attorneys should fear the wrath of not complying with the rules and dictates of the District Court but could with impunity disregard the rules of the Common Pleas Court and the feeling that the District Court is somehow superior to the local courts still permeates the legal atmosphere. We hope that our stand now will restore confidence in our Common Pleas Courts and a respect for its functions among the members of the bar.

This court is well aware of the fact that its rules and policy have met with resistance among members of the trial bar. It is also quite evident that the vigorous enforcement of this policy has led to a more efficient disposition of cases on this court's docket[22] and a corresponding decrease in the number of pending civil cases at issue and the average age of pending civil cases at issue. The attitude among some of the bar, however, is that the courts exist as their own personal vehicle to be manipulated to suit their schedules and the schedules of their clients and their many witnesses. As we have demonstrated, this attitude can no longer be permitted to prevail if we wish to maintain a system of justice which will accomplish its avowed purpose; the orderly resolve of disputes between members of society.

---

[22] Statistics for the four trial terms immediately following the announcement of the court's policy show that there were 2,884 cases disposed of under the supervision of the court. For the same four trial terms in the year preceding the adoption of the rule, only 2,179 cases were disposed of while under the supervision of the court, 25 percent less than after the adoption of the rule.

It is inevitable that until there is a general understanding among the public and the bar that in a few instances some attorneys may not be able to serve as many clients, clients which they were able to serve only at the expense of the court and delay of their clients' claim, delays which often as not were explained to the party litigant who wanted his case disposed of as the fault of an inefficient court. We believe, however, that in the long run the bar, the party litigants and the public will be the beneficiaries of this policy. An efficient system of justice which provides for the prompt and immediate disposition of a case and does not destroy the value of a case by making it wait on the docket for two, three, four or five years can only work to improve the image and confidence in our rule of law which, in turn, will restore confidence and improve relations with the members of the bar and the community as a whole.

Accordingly, the respective motions for a new trial and removal of the compulsory nonsuit will be dismissed.

## APPENDIX A

Local Rules of the Allegheny County Common Pleas Court 212 *I, II, V, VI, VII.

"RULE 212.

"*I. This rule shall govern pretrial conciliation and trial of cases in this court.

"A. For the purpose of this Rule, "pretrial" shall mean a type of conference described in Pa. R. C. P. 212. "Conciliation" shall mean a conference involving court supervised negotiations designed to produce an amicable settlement. Where the expression "pretrial-conciliation conference" appears, the conference may take the form of either a "pretrial" or "conciliation," or

both, at the option of the judge presiding at the conference.

"B. The term "party" or "parties" used hereinafter, shall mean the party or parties to the action, or his or their attorney or attorneys of record except in those rules which require the signature of verification of the actual party.

"C. All cases at issue shall be listed for pretrial conciliation and trial at times to be fixed by the court.

"*II. Notice of the pretrial-conciliation conference shall be given all parties by mail and/or publication in the Pittsburgh Legal Journal not less than sixty (60) days prior to the conference. Notice of specific time and date for the conference shall be given not less than two (2) weeks prior thereto. Any application for continuance of the conference shall be addressed to the judge to whom the case has been assigned.

"*V. After the date set for the pre-trial-conciliation conference there shall be no discovery proceedings whatsoever except by order of court issued by the judge who is assigned to preside at the pretrial-conciliation conference, or by agreement of counsel which does not result in delay of the trial of the case.

"*VI. In all trespass actions, and in other forms of action to the extent this rule may be applicable;

"A. Plaintiff, within thirty (30) days after notice of a pretrial-conciliation conference as provided in Paragraph II hereof:

"1. Shall serve upon all parties a written statement containing:

"a. All items of special damages which the plaintiff intends to prove, including medical bills, property damage bills (or estimates if there are no bills) and loss of earnings. Claims for loss of earnings shall set forth the names of employers, date of absences and rates of pay. If plaintiff is self-employed, information

which forms the basis for the loss of income attributable to the injuries shall be supplied.

"b. The names and addresses of all persons who may be called as witnesses, classifying them as liability and/or damage witnesses.

"c. Medical reports of any doctor who treated, examined, or was consulted in connection with the injuries complained of, and who may be called as a witness.

"d. The reports of any expert whose opinion will be offered in evidence at the time of trial. Such reports shall include the findings and conclusions of the expert.

"2. Shall file with the Prothonotary a statement containing 1. a. and b. above, and a certification over his signature that he has served upon all parties the statement and reports described in VI. A. 1. Such statement shall be called 'Plaintiffs Pre-Trial Statement.'

"3. Shall upon request of any defendant to the extent the same has not already been accomplished:

"a. Arrange for medical examination of plaintiff by a physician designated by the defendant, which examination shall take place at such time prior to the date set for the pre-trial conciliation conference as to make available the written report of such examination by the date of the conference.

"b. Furnish defendant written authorization to inspect the records of any hospital or clinic where plaintiff was treated for the injuries or disabilities complained of, and concerning prior injuries or disabilities where the same may be relevant.

"B. A counterclaimant shall be considered a plaintiff and shall comply with all applicable provisions of this Rule relating to plaintiffs.

"C. Defendant, within fifteen (15) days after the

time set for performance by the plaintiff under VI. A. and VI. B. hereof:

"1. Shall serve upon all other parties a written statement containing:

"a. The names and addresses of all persons who may be called as witnesses, classifying them as liability or damage witnesses.

"b. Estimates or reports of property damage sustained by the plaintiff.

"c. Medical reports of any doctor who examined the plaintiff on behalf of any defendant, and medical reports of any other doctor who treated, examined, or was consulted in connection with the injuries complained of and who may be called as a witness.

"d. The reports of any expert whose opinion will be offered in evidence at the time of trial. Such reports shall include the findings and conclusions of the expert.

"2. Shall file with the Prothonotary a statement containing 1.a. and b. above, and a certification over his signature that he has served upon all other parties the statement and reports described in VI. C.

"1. Such statement shall be entitled 'Defendant's Pre-trial Statement.'

"D. At least one week prior to the time fixed for the pre-trial-conciliation conference all parties shall confer and consult with each other as often as may be necessary for the following purposes:

"1. To explore in every respect the possibility of settlement, including exchange of a good faith demand and offer.

"2. To consider the factual and legal issues involved and to agree upon supplemental medical examinations, if requested, prior to the pre-trial-conciliation conference.

"3. To prepare a list of all exhibits to be offered in evidence numbered or lettered consecutively and note on each whether it may be offered without proof. All exhibits shall be made available to opposing parties for inspection and copying. If any exhibits are known to exist or probably will be required but are not available at the time, the substance thereof must be disclosed to opposing parties and numbers or letters shall be reserved for such exhibits. If not discovered or not realized to be necessary until after the pretrial-conciliation conference, then they must be marked before trial. The exhibit list shall be filed of record prior to the pretrial-conciliation conference. Exhibits not submitted and marked in this manner shall not be admitted at the trial unless the trial judge is satisfied that their existence or the necessity of introducing them could not have been determined at the earlier stages referred to in this paragraph.

"4. To execute a Certificate of Compliance as provided in paragraph IV B.

"E. Witnesses whose identities have not been revealed as provided in Paragraph VI. A. 1. b. and VI. C. 1. a., or whose reports have not been furnished under VI. A. 1. c. and d., and VI. C. 1. c. and d. supra will not, under any circumstances whatsoever, be permitted to testify at the subsequent trial of the case.

"*VII. For the purpose of this Rule a case is a "complex case" where: There are numerous parties: there are complex questions of law and/or facts; the trial of the case will probably be protracted; or, the orderly administration of justice requires that one judge be assigned to it.

"A. Where it appears at any stage of the proceedings that a case is a complex case, the calendar control judge on his own motion, or upon application of any party, or at the suggestion of any other judge before

whom the case may have come, may designate the case to be a complex case and assign it to a specific judge, who shall thereafter preside over all matters pertaining to the case, including trial.

"B. Except as expressly modified herein, the general procedure established by this Rule with respect to pre-trial-conciliation conference shall apply to a complex case.

"C. At the pre-trial-conciliation conference of a complex case the judge shall cause a record to be made, at the expense of the parties, which shall include all matters agreed upon or decided at the conference. At such conference the parties shall make full disclosure of the theories which they intend to pursue at the trial. Failure to make such disclosure shall require the exclusion at trial of any evidence relating to an undisclosed theory.

"D. After the complex case has been pretried and conciliated, a trial date shall be assigned to it by the calendar control judge after consultation with the judge to whom the case has been assigned.

## APPENDIX B

Local Rules of the Allegheny County Common Pleas Court 214 *(h).

"RULE 214 *(h). Issue Docket

"The Prothonotary shall keep an issue docket and shall enter cases therein when requested by any of the parties. The cases so entered shall receive consecutive numbers. No case shall be placed at issue until all pleadings have been filed and preliminary motions and objections disposed of. In no event shall a case be placed at issue earlier than sixty (60) days from the date of service of the original complaint upon the defendant. Cases placed at issue in violation of this rule shall be stricken from the issue docket. Such cases

shall receive a new number after full compliance with this Rule.

## APPENDIX C

Local Rules of the Allegheny County Common Pleas Court 249 *1.

"RULE 249 *1. Assignment Room

"(a) Except in cases of emergency, all motions, rules, petitions, and applications heard in the Assignment Room must be presented at 9:30 A.M. or at 1:30 P.M.

"(b) All preliminary motions, such as preliminary objections, rules to open or strike judgments, motions for more specific pleadings, lack of capacity to sue, questions of jurisdiction, misjoinder of causes of action, or non-joinder of necessary parties shall be disposed of by the Assignment Room judge. Upon the filing of such preliminary motion or matter, notice together with a memorandum of the law relied upon, shall be given to the adverse party five (5) days before the same is to be presented to the Assignment Room judge. Such notice shall state the date, time, and place when the preliminary motion or matter will be presented for argument and disposition. All such preliminary motions and matter together with the proposed order shall be presented to the Assignment Room judge at a date and time obtained from the Minute Clerk and shall be accompanied by the memorandum of law served on the adverse party. If the adverse party or parties intent to present a reply brief, it must be served on the proponent of the motions one (1) day prior to the date set for presentation.

## ORDER

And now, June 30, 1971, after review of the records, the arguments of counsel and consideration of the briefs, it is ordered and decreed that:

1. The motion for a new trial in the case of Budget

Laundry Company v. Carl P. Munter and Joseph S. Davis, trading as Allied Uniform and Towel Supply Company, July term, 1968, no. 2362, be and is hereby dismissed.

2. The motion to remove the compulsory nonsuit in the case of Ronald A. Connor, a minor by his guardian, Pearl Connor and Pearl Connor, parent of said minor, in her own right v. Duquesne Brewing Company of Pittsburgh v. William Bookameyer, April term, 1970, no. 1017, and Charles F. Harvey, a minor, by his guardian Barbara A. Harvey and Barbara A. Harvey, mother of said minor in her own right v. Duquesne Brewing Company of Pittsburgh v. William Bookameyer, April term, 1970, no. 2309, and is hereby refused.